

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

October 13, 2017

<u>BY CM/ECF</u>

Honorable John G. Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

     Re:   *United States* v. *Robert Rimberg*, S4 15 Cr. 835 (JGK)

Dear Judge Koeltl:

     The Government respectfully submits this letter in connection with the sentencing of the above-captioned defendant, Robert Rimberg, which is scheduled to occur on October 20, 2017 at 11:00 a.m., and in response to the defendant's sentencing submission dated October 3, 2017 ("Def. Submission").  The parties have agreed that the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range applicable to the defendant's conduct is 12 to 18 months' imprisonment, and Probation agrees with this calculation.

## BACKGROUND

**I.**    **The Offense Conduct**

     This case stems from an investigation into potential money laundering by members of a Colombian drug trafficking organization between approximately 2010 and 2011.  Around that time, law enforcement agents learned from a confidential source ("CS-1") that a member of the organization at issue was attempting to build a hedge fund-like infrastructure in the United States in order to help launder drug proceeds.  (April 10, 2017 Presentence Report ¶ 11 ("PSR")).  Members of the organization, acting through various intermediaries including and individual named Francisco Saez, ultimately paid $200,000 to a law firm associated with the defendant, Todd, Ferentz, Schwartz & Rimberg ("TFSR"), in order to perform legal work in connection with the project.  (*Id.*)  There is no evidence, however, that the defendant understood the ultimate purpose of this legal work or the nature of the client's business (the firm was engaged through several intermediaries working on behalf of the aforementioned organization).

     In part because of this payment, CS-1 was directed to engage in additional money laundering activities with Saez. CS-1 subsequently asked Saez to move bulk amounts of cash on

Honorable John G. Koeltl
October 13, 2017
Page 2 of 5

CS-1's behalf. (PSR ¶ 12). Saez agreed to engage in this activity, ultimately receiving assistance from the other defendants in this case. (*Id.*).

CS-1 initiated three money-laundering transactions, the first two of which involved Saez and David Schwartz, who was also charged, and the final of which additionally involved Rimberg. The first transaction occurred on or about August 19, 2010. On or about that date, CS-1 met with Saez at TFSR's offices in Los Angeles, California. During the meeting, CS-1 gave Saez a bag containing approximately $200,000 in cash and told him to wire the money to a bank account that, unbeknownst to Saez, was actually controlled by law enforcement. (PSR ¶ 13). Schwartz subsequently arranged for approximately $184,668.96, representing the $200,000 in cash minus commissions charged by Saez for transferring the money, to be wired from a bank account controlled by TFSR to the account provided by CS-1. (*Id.*). The wire details for this transfer, moreover, described the funds and the proceeds of a settlement, which plainly concealed the nature and source of the funds being transferred.

Similarly, on or about October 5, 2010, CS-1 met with Saez at TFSR's office in Los Angeles, California and gave Saez a bag containing approximately $300,000 in cash. (PSR ¶ 14). CS-1 instructed Saez to wire the money to another bank account that was again controlled by law enforcement. Over the next several weeks, Saez arranged for the money CS-1 gave him, minus commissions, to be wired to the account provided by CS-1. (*Id.*).

CS-1 and Saez subsequently began discussing a larger series of transactions that would begin with CS-1 providing Saez with a million dollars in cash so that Saez could prove his ability to move larger quantities of cash. (PSR ¶ 15). Assuming the Saez would be able to transfer this amount cash, CS-1 promised that millions more would be delivered on a regular basis each month. Given the increased size of the transfers, CS-1 requested additional visibility into the mechanics by which Saez would launder the money, resulting in a series of meetings at TFSR's offices in New York and Los Angeles.

On November 18 and November 19, 2010, for example, Saez, CS-1, a second confidential source ("CS-2"), David Schwartz, the defendant, and others met in TFSR's New York office. During these meetings, CS-2 represented to Rimberg, Schwartz, and Saez, in substance and in part, that CS-2 had a significant amount of "street money" that he wanted the TFSR to transfer for him. (PSR ¶ 15). Schwartz pitched CS-2 on various real-estate and movie investments, but CS-2 declined. CS-2 expressly stated, among other things, that "[i]t's—it's basically this: sending the money. I represent an association that moves millions of dollars, street money, to be honest with you. . . . We're not doing investments." At other times during the meetings, CS-2 stated, "When we receive the money, we want that money to be clean . . . ." And CS-2 at various times asked to make sure that "there are no cops here," stating, in substance and in part, that if something goes wrong, "I'm the one who gets killed."[1]

---

[1] Additional meetings with CS-2 occurred after this date, although Rimberg was not present for them. On or about December 1, 2010, for example, CS-2 met with Schwartz and Saez at Schwartz's office in Los Angeles, New York. During the meeting, CS-2 stated that his business was "not legit" and further represented his organization to be involved with drug trafficking.

On December 6, 2010, CS-1 met with Saez at the defendant's office in New York with approximately $1 million in cash in a suitcase. (PSR ¶ 18). Rimberg gave Saez a money counter during the beginning of the meeting but was not otherwise present. (*Id.*). CS-1 subsequently provided Saez with information for a bank account that, again, unbeknownst to Saez, was controlled by law enforcement. (*Id.*).

In order to transfer the $1 million in cash that he and Saez had received from CS-1 to the bank account CS-1 had provided, the defendant took approximately $250,000 of the cash and used it to buy gold bars. The defendant subsequently transferred funds electronically to Schwartz. (*Id.*). Schwartz then transferred the money to an account controlled by a person with whom he was producing a movie ("Person-1"), and then caused Person-1 to transfer the money to the account provided by CS-1. Notably, Schwartz and Person-1 created fake invoices to make it seem as if the transfers were to pay for expenses related to the movie, when, in reality, there was no economic substance to the transactions at all.

## II.     The Defendant's Offense Level and Criminal History Category

On Janaury 5, 2017, the defendant pled guilty before Your Honor to operating an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 1960. Rimberg pled guilty pursuant to a plea agreement in which he and the Government agreed that base offense level for this offense, given the amount of funds he transmitted, was 18 pursuant to Sections 2S1.3(a)(2) and 2B1.1(b)(1)(G) of the Guidelines; that the defendant would receive a two-level reduction for being a minor participant in the offense pursuant to Section 3B1.2(b) of the Guidelines; and that he would receive a three-level reduction for acceptance of responsibility pursuant to Section 3E1.1(a) and (b). Because he did not have any criminal history, Rimberg's Criminal History Category was I. This resulted in a Guidelines range of 12 to 18 months' imprisonment (the "Stipulated Guidelines Range").

Probation agrees with this calculation. (PSR ¶ 86).

## **DISCUSSION**

As the Court knows, a sentencing judge must begin the process of imposing sentence by calculating the applicable Guidelines range. *See United States* v. *Corsey*, 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence."); *United States* v. *Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) ("Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable."). After calculating the applicable Guidelines range, a court may impose a sentence above or below the Guidelines range in order to meet the sentencing goals set forth in Section 3553(a) if "the court finds that there exists an

---

Schwartz, in turn, told CS-2 that "[w]e can't share what you do" but again offered to invest CS-2's money so that CS-2 could "sleep at night" and "have a real business." (PSR ¶ 16).

aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into considering by the Sentencing Commission." U.S.S.G. § 3553(b)(1).  The sentencing goals identified in Section 3553(a) include, among other things, promoting respect for the law, providing just punishment, and deterring criminal conduct.  *See United States* v. *Park*, 758 F.3d 193, 197 (2d Cir. 2014) (citing 18 U.S.C. § 3553(a)(2)).[2]

In light of the circumstances here, the Government respectfully submits that a sentence within the Stipulated Guidelines Range would not be inappropriate.

The defendant's conduct demonstrates a remarkable calousness for an experienced lawyer.  To say that receiving a million dollars in a suitcase should raise red flags is an obvious understatement, even for someone with no legal training, and yet instead of making any efforts to verify the source of the funds or their destination, the defendant handed Saez a money counter and ultimately wired funds to Schwartz so that they could be remitted to the international account provided by CS-1.  Rimberg, moreover, made very little money on the transaction (the total fee for the firm was 6%), which amplifies the concern; it is difficult to comprehend why any attorney would agree to conduct cash transfers with no economic purpose given the risks involved, but it is even more difficult to comprehend why someone would do so without significant monetary incentives.   Indeed, Saez recognized the absurdity of their actions.  In an intercepted call with another individual on or about December 1, 2015, Saez stated, in substance and in part, that he did not think Rimberg and Schwartz would risk their "entire law firm" for the limited commissions they expected to receive on the "dubious transactions" with "uncivilized people" under consideration.  And yet that is exactly what the defendants did.

Further, there is a significant need for general deterrence under the circumstances.  Cases involving the improper transfer of money and money laundering are difficult to detect and prosecute.  Improper transactions can be disguised and hidden, just as they were here; Rimberg took cash and used it in various transactions, and then transferred preexisting funds to Schwartz so that the source of the money would remain opaque.  In effecting the ultimate transfer to the account provided by CS-1, moreover, Schwartz simply arranged for the creation of false invoices to make it seem as if a transaction with no economic purpose was in reality a routine payment in connection with a movie he was helping produce.  And yet despite the difficulty of detection, money laundering is nearly always necessarily for the accomplishment of crimes such as fraud offenses and large-scale drug trafficking.  Were individuals unwilling to engage in money

---

[2]  The full set of factors outlined in Section 3553(a) are: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, namely the need (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," (b) "to afford adequate deterrence to criminal conduct," (c) "to protect the public from further crimes of the defendant," and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims."  18 U.S.C. § 3553(a)(1)-(7).

laundering, in other words, the economic rewards of certain crimes, and thus the incentives to commit them in the first instance, would be significantly reduced.

On the other side of the equation, there is no denying that Rimberg's history and characteristics favor leniency when weighing the relevant considerations under Section 3553. Rimberg's submission points to a number of difficulties that he overcame as a child and shows him to be a caring husband and father. There is also a reduced need for specific deterrence in light of the defendant's likely loss of his ability to practice law.

That said, the loss of Rimberg's law license should not itself be considered a collateral consequence that independently warrants leniency. To put it bluntly, Rimberg's loss of his law license is understandable in light of the conduct at issue here; again, someone should not be practicing law to the extent they are literally accepting bags of cash described in meetings as "street money" that "we want . . . to be clean." And while Rimberg also claims that he will suffer the "additional collateral consequence[]" of being unable to work in fields such as "the lending industry, the FDIC . . . or as a non-attorney representative of a client seeking any government benefits in the banking, commodities, or securities industry" (Def. Submission at 24 (citations omitted)), this claim should be given little weight. The consequences Rimberg identifies are imposed upon every defendant who is convicted of a felony, and Rimbeg is better situated to absorb them than most defendants. He has over $10,000,000 in assets (PSR ¶ 70), multiple residences (PSR ¶ 74), and significant real-estate investments (PSR ¶¶ 71, 73). Put simply, the defendant will be able to provide for himself or his family upon the conclusion of a criminal sentence. Further, there is no evidence that the defendant is qualified for, or intends to, pursue a career in fields that he identifies as foreclosed.

### Conclusion

For the reasons set forth above, the Government respectfully submits that a sentence within the Guidelines range stipulated by the parties would not be inappropriate.

Respectfully submitted,

JOON H. KIM
Acting United States Attorney

By:   _____/s/_____
Robert Allen
Assistant United States Attorney
(212) 637-2216

cc:  Michael Bachner, Esq. (counsel for defendant)